Mr. Morrison, I note that you've been appointed under the Criminal Justice Act, and I want you to know the court appreciates your taking the appointment and advocating on behalf of your client. It's my pleasure and my honor, Your Honor. Judge Kelly, Judge Arnold, good morning, Judge Strauss, good morning, and congratulations on finally being elevated to the Eighth Circuit. My name is Stephen Morrison, and I represent Pamela Bravebull. While we've argued six issues in the blue brief, I'd like to focus on the first two, perhaps the first three, but of course I'm happy to take the Court's lead as to where you all would like to go. As far as the first issue goes, this eliciting expert testimony from a veneer person, I won't belabor what actually happened that was described in the blue brief, but I'd like to focus on what I think this Court's standard should be when it comes to what appears to be a case of first impression. The standard is this, I believe, where the jury's ability to decide a question, it must decide, has been determined in voir dire, you cannot go further. The government in this case went far beyond that. The government elicited expert testimony. It qualified Mr. Merck as an expert. It elicited specific facts. You can strike harder with a foot. The foot is protected by a shod foot. And then, in the government's opening and closing, referred directly back to that, what I'm calling testimony. I noticed there wasn't, as I understand it, an objection made at the time to the? There was not an objection. Oh, you've got a pretty big rock to push up the hill here, I think, because you have to show not only error, but plain error, right, and that you're entitled to plain error relief. And I'd refer back to the standard I described, where the jury's ability to decide a question, it must decide, has been determined, you cannot go further. If the government goes slightly further, as any attorney might, by accident, certainly you can't show plain error. But if there is plain error in a circumstance such as this, it's this case. The government was brazen in referring to Mr. Merck's statements at opening and closing. In the part of the plain error analysis, though, showing that there's a likelihood of a material effect on the verdict or on the result? Normally that would be the case, Your Honor, but in this case, this error was structural. There were numerous constitutional and federal rules of evidence violations. It was structural, and as the Supreme Court said in Weaver v. Massachusetts, with structural error, you don't need to show prejudice. What about the plainness of the error? You said this is a question of first impression, and one of the things that has to be clear or obvious to the trial court judge and to the parties. Is there a case, is there something that shows that doing this would be improper? I don't believe so, Your Honor. I've certainly looked. The government cites Warbritain in its support, but Warbritain isn't applicable. That dealt with the prosecutor himself saying, you're going to see the good, the bad, and the ugly of the defendant's criminal record. Now that was potentially error. That was certainly not a case of first impression because we have a long history of jurisprudence dealing with prosecutor's statements that are improper. I haven't found a case in which you have this eliciting of what is essentially expert testimony. Now of course . . . I wonder if it couldn't be characterized as a statement of law, which is something the lawyer . . . You're absolutely right. Maybe that's the real difficulty here. I think the prosecutor acted improperly, and I think the district court acted improperly in not shutting this down. That's where the error is on both of those counts. How can it be clear or obvious though if there's nothing that tells the district court they can't do this? The reason, let me give you the background, is oftentimes to try to root out biases and prejudices, the attorneys can be pretty aggressive during voir dire, and the dividing line may not always be clear. Without anything telling the trial judge this was a problem, how could it be clear or obvious? Absolutely you're correct, Your Honor, and while I would love this tribunal to find in favor of Pamela Brave Bull, I recognize that that's a difficult hurdle to overcome, I would simply say two things to that. First of all, the error in this case was just . . . it was so patent, and I can run through the details, as Your Honor is well aware, but if this court is not inclined to issue a ruling in favor of Ms. Brave Bull, I would ask this court to issue a clear ruling that is prospective, that would prevent this type of thing from happening in the future. And by the way, a ruling that would establish the standard I'm suggesting is not necessarily or always beneficial to criminal defense attorneys. Was the error here really . . . I mean, here's . . . I guess this gets at my . . . a little bit at my earlier question. Was the error here really bringing this up again in opening and closing statements and treating it like evidence? Because as I mentioned, attorneys can be quite aggressive in their questioning, can elicit a lot of different testimony to try to figure out whether jurors are biased or whatever. Was the error here really then treating it as testimony, or was the error the type of questioning that occurred during the voir dire? Well, I think you can't treat either of those in isolation. And Your Honor's absolutely correct that there is aggressive testimony or aggressive questioning at voir dire. In North Dakota, we . . . lawyers have a habit of introducing themselves to the jury. Well, I grew up here, and I have three kids, and so forth. And that would actually meet my standard, because lawyers are seen as these imposing inhuman people. And to humanize themselves in front of the jury would allow the jury simply to listen to their case and reach an unbiased judgment or verdict in accordance with the law. But in this case, the government qualified Mr. Merck as a martial arts expert, elicited specific testimony, specific statements, referred back to those statements in opening and closing. And by the way . . . Wasn't it clear that all of those references were to those statements, I don't think, from the record? I think it is clear, Your Honor. It was in . . . I believe it was in closing. The government says, we talked a lot about this in jury selection, that a shod foot can be a dangerous weapon. The government said that in its closing. In addition to that, the government almost verbatim repeated what Mr. Merck says. You can strike harder. You can kick harder. A shod foot protects the foot. It adds weight. Isn't that simply an echo of the original statements in the Board of Honors that it . . . Absolutely. Absolutely. And essentially, that was the prosecutor in opening and closing, asserting facts that legally speaking are not in evidence. And by the way, the government's use of Mr. Merck's statement extends to its red brief. On page 13, the government mentions that a jury could infer that the kick involved had to be protected by a shod foot. That comes from Mr. Merck's statements. Remind me, please, exactly how the judge charged the jury on the definition of a dangerous weapon and the extent to which the court talked about a shod foot being one? I believe the jury instruction was the Eighth Circuit model jury instruction. I don't think there was anything special about it. I think . . . Is there anything in there specifically about a shod foot being possible for such a thing to be a dangerous weapon? I believe there was. I don't recall specifically. But I have no issue with that instruction. I know that. I'm just wondering if basically the same kinds of things came out of the mouth of the judge during instructions where the harm is. Well, the judge certainly didn't repeat the words of Mr. Merck. That was reserved to the prosecutor. I'll take a close look at that. Thank you. Sure. Absolutely. It seemed like the key factual dispute here was really whether she was shod, whether the opposed to whether a foot with a shoe would be a dangerous weapon. I'm happy to say that she was wearing some sort of footwear. I think given the record, that's indisputable. But this goes to issue number two, which is whether it's required to describe what type of shoe or what type of footwear there was. And on this point, I think the cases are in our favor. You can look to Phelps, which is an Eighth Circuit case from 1999. In that case, the question was assault with a dangerous weapon to a shotgun. Fired it possibly 257 yards, perhaps less. And in that case, this court upheld the assault with a dangerous weapon verdict, but upheld it because there was evidence of the distance and the type of pellets used. Had there been evidence only of a shotgun, it's arguable that this court would have reversed that conviction. What we have here is not only similar, but it's even better for Ms. Brayful because all we have evidence of is some type of footwear. And if you look to the Alaska court in Ransom, the New York court in Bird, both of those courts said you need more evidence than just it was a shoe. In Lee, which is a Florida case, and Stroman, which is a D.C. case, both of those courts held flip-flops are per se not a dangerous weapon. And there's some indication that at the very least, Tyanne Brayful was wearing Nike sandals, which as far as I understand are akin to flip-flops. On the government side, the four cases that the government highlights for Issue 2 really have nothing to do with this. Tillman has to do with sufficient evidence of a drug conspiracy, which of course conspiracies are a unique beast. Sullivan has to do with sufficient evidence of a drug possession, and in that case, Sullivan actually admitted to the officer when the officer stopped him that he was carrying illegal substances. The Schmidt case really has nothing to do with footwear, it's a Fourth Amendment search and seizure case. And then finally, Steele did, I believe, uphold conviction for assault with a dangerous weapon, but there was specific evidence that the shoe involved was a tennis shoe. What about the testimony from the victim herself, what she felt? Is that going to be enough that the jury can make an inference that the way the victim felt and then the injuries that resulted, that there must have been something more than a Nike sandal or a flip-flop? No, Your Honor. There are essentially three things we can point to here. First, the victim, Ms. Seawalker, said she could feel the shoe because she was getting scraped. Now, if this court wants to say that getting scraped is serious bodily injury, perhaps Ms. Braybill loses, but all sorts of footwear can scrape somebody. She noted that it wasn't skin-on-skin contact. Well, is it skin-on-steel-toed work boot, skin-on-a-jelly shoe, skin-on-a-flip-flop? She didn't say anything about that. Second, the government, I'm sorry, Seawalker mentioned the kicks were repeated. Well, that says nothing about what type of shoe was involved. And then third, the government suggests that because there was serious bodily injury, there must have been a dangerous weapon involved. But that can't be the case. Otherwise, the element of dangerous weapon would simply collapse into that of serious bodily injury. So, no, Your Honor, what Seawalker testified to was certainly compelling testimony of assault, but not assault with a certain type of shoe. And you need to have evidence of that type of shoe. And by the way, it would not have been difficult for the government to elicit this. All the government had to do was get the neighbor across the street to testify that, yep, it was a tennis shoe. The government didn't do that. It was in the police report. Why didn't the government call this witness? I submit it's because the government didn't know what type of shoe it was. And you need that. I see I'm over a bit of my time, and I'd like to reserve the last two minutes for rebuttal, if I may. Mr. DeLorme. Judge Kelly, may it please the court, my name is Gary DeLorme, I'm in counsel. I'm an assistant United States attorney in the District of North Dakota, Bismarck. I was also trial counsel in this particular matter. I want to first start with a couple of questions that the court asked. Judge Strauss, you asked about the opening and closing statements. When you look at the context of the referral back to the discussion of this legal concept during voir dire, it was merely reminding the jury or reintroducing that we had talked about this legal concept. And it's a legal concept. And it's a legal concept that lay people are not entirely aware of. When you take four words and put them together, shod foot, dangerous weapon. I guess this may be a difficulty that I have with it, and that is that you are talking about legal concepts, which is ordinarily the province of the court. It is, Your Honor. But for a particular concept like this, if you can't understand whether or not a jury can at least accept that a shod foot can be used as a dangerous weapon, how are you going to be able to use your preemptory challenges to call out those juries that might not be favorable to the government in this particular case? When I look at the case, what we're trying to talk about here and what Mr. Morrison is trying to present to the panelists, let's lose the force for the trees here. Let's take everything that the Eighth Circuit has already done with shod feet and let's focus on what type of shoe. Let's as a panel decide that we're going to make the decision from now on on what kind of shoe is going to be used in a shod foot assault. We're going to say whether or not it's going to be a tennis shoe. Not only that, but we're going to say that it has to be a tennis shoe with a certain type of rubber, with a certain density to it. I guess what I'm saying is that the jury's curiosity about whether a shod foot can be a dangerous weapon is something that it's up to the judge to explain rather than up to someone doing voir dire to explain. Well, it is, Your Honor, to the extent that the instructions that were provided by the court . . . I'm not saying it was a misstatement of law. I'm just saying it was not an appropriate time to be talking about the law. Well, that's a suggestion. And I disagree with that, Your Honor, because this court has already decided in U.S. v. Walker and a couple of other cases that whether or not a shod foot is used as a dangerous weapon is a question of fact for the jury to find. So they have to understand whether or not, from my perspective when I'm presenting a case, whether or not they can understand and proceed with the ideal that a shod foot can be a dangerous weapon. Well, and that's actually my problem with it. You know, you do use the word agreed, and I understand that, and I think I agree with you that it wasn't a suggestion, it was a stipulation. But when you say, as we talked about in jury selection, we agreed that a foot could be a weapon based on how it was used, and then later in that same passage, you repeat and use the same language that the juror Merck used in describing how a shod foot could be used as a weapon. To me, that is treating his statements as if they were the testimony of an expert witness. Now, maybe that's not what you meant to do, but if I'm the juror sitting there, and I'm reading a cold record, so I don't know how it was presented, but I'm sitting there thinking you're telling me that this expert has told me the characteristics of a shod foot that could make it a dangerous weapon. Why am I wrong about that? Yeah, Judge, I think you're wrong, because, I mean, what we weren't doing in Gwadir was eliciting expert testimony. And what we were doing is using that which we have presented for us, and it's no different in any case that you probably had experience in. Defense attorneys do it all the time, prosecutors do it all the time. When we're allowed to participate in Gwadir, I've had a number of cases where I charge child sexual assaults on a number of basis, where defense attorneys will particularly point out or pick out a person that's a counselor, a high school counselor, or a principal, or a superintendent. And they will identify that individual, and they will go after that individual to the extent that they want to develop that, hey, you know, in your experience, kids lie, don't they? And of course, that person is going to indicate, yes, kids do lie. I've had a number of experiences where children have lied. It's no different than that. I was merely reminding them of the conversation we had where we talked about this is the concept. We all agreed at the end, and I said, we all agreed, we agreed that a shod foot could be a dangerous weapon. I don't have a problem with the questioning. The questioning, I think, did not probably cross the line. Where I have a problem with is the way it was characterized in this passage. It'd be one thing to say, as a reminder, we talked about this during Gwadir, and I questioned a lot of you about this, and here's what we're going to present, rather than relying on the words that the particular juror used. That seems to me to be different. Right, Judge Strauss, but it was always followed up with, this is what we presented. This is what you need to find. We agreed that a shod foot could become a weapon, but you need to make a determination. And they have to make that determination, because it is a question of fact. Whether or not the shod foot used in that particular case was used with the intent to be a dangerous weapon. I've always couched that in the opening and closing statements. We agreed that a shod foot could become a weapon, a dangerous weapon. You still need to find it based on the facts of the case. And then I outlined the facts of the case. In this particular case, we had a number of witnesses that testified that both these individuals were wearing shoes. Redstone, the neighbor, testified that she witnessed the assault that both Tyann and Pamela Brave Bull were kicking both individuals with shoes on. Did you present evidence later on during the trial, and I was looking through the record trying to find this, that echoes the statements that were made by Juror Merk. In other words, did you present an expert or anybody who said these types of shoes could, for example, allow you to be able to kick a lot harder, which is part of your opening statement. And that when you kick somebody with a shod foot, you're able to have that additional weight, and you're able to kick a lot longer than if you were barefoot. Was there anyone other than Merk that supported any of this during the evidence of trial? No, Your Honor, but the facts that the witnesses testified to outlined how these shoes were used in this particular case. When you have Annette Forth testified that she witnessed the kicks of Tyann and Pamela, and that those kicks were akin to striking a soccer ball. So they were full wind up kicks, kicking hard, kicking fast. You have the witness across the street who was talking about kicking and stomping of the individuals. So the facts presented through the witnesses did indicate that, yes, these shoes would have allowed these individuals to kick harder, kick faster. They were able to stomp on the individuals in this particular matter. But no, I did not elicit any kind of expert testimony to come in and talk about that themselves. As far as identifying which shoes were used, well, that's not always an easy thing to do. I mean, people don't specifically look at somebody in an assault and say, my, look at that, this person's wearing Louis Vuitton shoes. They're not going to do that. They're not going to look and say they're wearing tennis shoes. What you have in this particular case is you have the victim herself saying, I know I was getting kicked with something, and it wasn't a foot. It was a shoe because I could feel the scrape of it. You have Redstone, the neighbor across the, or the next door neighbor basically, saying I was fairly close. I was looking out my window having coffee, and I saw them both kicking and stomping with shoes on. Does it matter what type of shoe? Now, there's a wide range of shoes, okay, and I'll say it, with women, there may be even a wider range, right? There could be a ballet slipper type shoe, I don't know, I think jelly shoes, I don't know if those are still in fashion or not. Or all the way to a boot. Does it matter that maybe you could see a shoe, and that's all the testimony is, but really what you're saying is I just saw the foot being covered by something that may or may not have had the sturdy kind of ability to cause harm. Right, Your Honor, and I don't think that, yeah, I agree, I don't think it really matters. Again, it's depending on how that shod foot is used, regardless of what the covering really is. I had a case that came to me several years ago, and it was a shod foot assault as presented to me in paper regarding individuals in a correctional facility in Standing Rock. Well, they were all wearing Croc shoes. And I didn't think that I would probably want to present Croc shoes as a shod foot weapon to a jury. However, I was presented a video, and in the video I could see the individual jumping into the air and coming down in a very hard stomping manner, as hard as he could, and the shod foot, the Crocs, did help with that. I think jelly shoe was, Your Honor, I mean, if they're protective enough to allow that individual to come down and stomp on somebody, whether you would not do that with a plain foot, that would be considered a dangerous weapon, or a jury could at least determine that. Could not a foot be a dangerous weapon? Your Honor, I think so. I do. I think the case law- So, do you have to charge the particular weapon? And, you know what I'm saying? Does the charge require that you put out, you set out in the indictment or in the, otherwise, what the weapon was? Well, yes, I think a foot itself could be, Your Honor. Sorry? I think a foot could be, but depending on how it's used, but I think the way the case law has developed, you have to have some sort of object. A fist wouldn't count? I don't think so, but I have charged cases where an individual has more- That wasn't a rhetorical question, it was something I was just wondering. Right, and I think because of the case law and the way it's developed, with the object, so you have to have some sort of object that allows it to be a dangerous weapon. As far as the issue three, I know Mr. Morrison wanted to talk about that multiplicity. I looked at this, and in this particular manner, this court has long ago determined with these particular charges, with a RISB assault resulting in serious bodily injury, an ADW, assault with a dangerous weapon, that they are not multiplicitous in the way they are charged. What relevance is there, though, to the point that was made in the briefs that those cases arose under a different version of the statute? The earlier cases, is there any relevance to that? I don't think it changes anything, Your Honor. When you take a block burglary test, you apply that, and you look at this, and it doesn't change the intent that's needed for either of the crimes. I mean, a RISB is a general intent crime, assault with a dangerous weapon is a specific intent crime. To read them together, then, it would be detrimental to prosecutions. I mean, if you were restricted to saying, I'm either going with this or that, or I'm going to have to charge it with, you have to find this or this to a jury, I think we limit ourselves in prosecution. And the court, like I said long ago, determined that these two, with the block burglary test applied, given the different intents that are required, that they are not multiplicitous, and they've been charged numerous times before this panel. As far as the instructions, Judge Arnold, you brought those up. Did Judge Hovland, in this particular matter, use the model instructions? And I believe that you do just insert where it's, as far as shot feet, you can find that a shot foot is a dangerous weapon if it was used with the intent to cause serious bodily injury. There's a specific reference to shot foot in the instruction. I believe there is. There's a general instruction, and then also a specific about how it could be, can be. Yes, correct, and then Judge Hovland has always relied on model instructions. Yeah, I guess that was my, if I have a difficulty with the board IR, so it seems to me you're sort of anticipating the instruction. And I'm a little uncertain about whether that's not something that's, that invades the province of the judge. You know, and it, that may, you know, I know Judge Hovland allows us to use the instructions as we talk to panels. And during a board IR, that's a custom? That is kind of a custom, yes. He does provide it to us ahead of time. We don't actually finalize the instructions until that morning. So once we finalize it, then we're able to kind of talk about, this is what you're going to, you might see, this is a concept. Does anybody have any kind of issue with that? That's worth revealing. Thank you. Thank you, Your Honor. Real briefly, I just want to talk about the intoxication defense request. Obviously that request was made, it was declined by the judge. There was simply no basis for it with the facts that were presented in this particular case, except for the fact that she did test out or the preliminary breath test was a 0.125 when she was incarcerated later that evening. However, there were testimonies that she had been drinking in the intervening time between the assault and the arrest. Other than that, the arresting officer indicated that she was very comprehensive, had no issues with understanding what was going on with the arrest or otherwise. In fact, the defense the entire time was essentially, I was there, but I didn't do anything. So it's kind of hard to say, well, you presented this defense throughout this trial, but now you want to have this affirmative defense that really only applies if you're agreeing that you did something, but you were too intoxicated to the point that it was impossible for you to form the record with an intent to commit the crime. I think the court was proper in denying that particular instruction in this particular matter. As far as the rest of what I have, that concludes my presentation to the court. Seeing no further questions, I would ask the court to affirm the convictions of Ms. Grable. Thank you. Thank you, Your Honor. Just three brief points in rebuttal. First, the government suggests that it doesn't matter what type of shoe it is. If this court finds that, then it would be going against every court with the possible exception of Pennsylvania state courts that have ruled on the issue. The second point is that the government said you can't always tell what type of shoes were worn. That's absolutely true, but in this case, Arvella Forth reported to the police that the Brables were wearing tennis shoes. Just put Arvella Forth on the stand, and have her say they were tennis shoes, and we lose. Third, the government says that lay people aren't really aware of this notion of a shod foot, but that doesn't really make much sense, because in Voir dire, the government asked, hey, does anybody have a problem with a shod foot being a dangerous weapon? Nobody said anything. And in the government's red brief on page 18, the government writes that the concept of a shod foot as a dangerous weapon was not exclusive to this one veneer person, Mr. Merck. Presumptively, all of the veneer persons would know through their own life experiences that a foot with a shoe on it would be heavier and capable of a striking harder and more repeatedly as compared to the barefoot. Well, so which one is it? Did you try the case? I did not. Did counsel raise that issue in Voir dire for the defendant? And raise any conversation about the shod foot issue? Certainly not in direct response to what the government said, so I don't believe so. Those are essentially my three points on rebuttal, and I would ask this court, based on all six issues, to reverse both of Ms. Brable's convictions. Thank you. Thank you. Thank you to the parties for your briefing and your arguments, and the case is now submitted.